## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**MARY T. BUSCH**,

          Plaintiff,

    v.

**JO ANNE B. BARNHART,**
**Commissioner of the Social Security**
**Administration,**

          Defendant.

Civil No. 04-4315 (JNE/JGL)

**REPORT AND**
**RECOMMENDATION**

---

### APPEARANCES

John C. Peterson, Esq. for Plaintiff

Lonnie F. Bryan, Esq. for Defendant

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

       Plaintiff Mary Busch seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied her application for disability insurance benefits.  The matter has been referred to the undersigned Chief United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.  The parties have submitted cross motions for summary judgment.  For the reasons

set forth below, this Court recommends that the Commissioner's decision be affirmed and the case be dismissed with prejudice.

## I.    INTRODUCTION

Ms. Busch filed an application for disability insurance benefits on September 3, 2002, alleging she had been disabled since November 17, 2001 due to injuries sustained in a motorcycle accident.   The Social Security Administration denied the application initially and on reconsideration.   Ms. Busch timely filed a request for a hearing, which was held before an Administrative Law Judge ("ALJ") on April 6, 2004.   Ms. Busch appeared at the hearing with her counsel and testified.   A medical expert, Dr. Karen Butler; a vocational expert, Kathryn Schrot; and Ms. Busch's husband also testified.

On June 23, 2004, the ALJ issued an unfavorable decision.   (R. at 11-23.)   In the decision, the ALJ employed the five-step, sequential analysis provided in 20 C.F.R. § 404.1520.   At step one, the ALJ found that Ms. Busch had not engaged in any substantial gainful activity since the alleged onset of disability.   At step two, the ALJ found that Ms. Busch was severely impaired by a history of a motorcycle accident with a traumatic brain injury, a left ankle fracture, a left wrist fracture, a fracture of the cervical spine at C2, multiple thoracic fractures, and multiple facial fractures, and a history of possible alcohol abuse in remission.   At step three, the ALJ determined that Ms.

- 2 -

Busch's impairments met § 12.02 of the Listing of Impairments for the time

period from November 17, 2001 to November 30, 2002.  However, Ms. Busch's

impairments did not meet or equal a listing after December 1, 2002.  The ALJ

concluded that as of December 1, 2002, Ms. Busch's mental condition was so

improved that her impairment no longer met the requirements of § 12.02.  The

ALJ then progressed to step four and concluded that Ms. Busch retained the

residual functional capacity ("RFC") to perform her past relevant work as a food

assembler or production worker.  Because the ALJ found that Ms. Busch

could return to her past relevant work, she was not required to address

whether Ms. Busch could perform other jobs.  Nevertheless, the ALJ found at

step five that Ms. Busch could also work as a hand assembler or packager,

based on the testimony of the vocational expert.

Ms. Busch sought review of the ALJ's decision by the Appeals

Council, which denied the request for review.  The decision of the ALJ

therefore became the final decision of the Commissioner.

## II.    DISCUSSION

Ms. Busch challenges only the ALJ's determination that she was

not disabled as of December 1, 2002.

Judicial review of the Commissioner's decision is limited to a

determination of whether that decision is supported by substantial evidence

on the record as a whole.  42 U.S.C. § 405(g); <u>Brand v. Sec'y of Dep't of Health,</u> <u>Educ., & Welfare</u>, 623 F.2d 523, 527 (8th Cir. 1980).  In determining whether evidence is substantial, the Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  <u>Warburton</u> <u>v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  <u>Robinson v. Sullivan</u>, 956 F.2d 836, 838 (8th Cir. 1992).  If the Commissioner's decision is based on substantial evidence in the record, the Court may not reverse it merely because other substantial evidence would have supported a different outcome.  <u>Roberts v.</u> <u>Apfel</u>, 222 F.3d 466, 468 (8th Cir. 2000) (citing <u>Craig v. Apfel</u>, 212 F.3d 433, 436 (8th Cir. 2000)).

## A.    <u>The Record Evidence</u>

### 1.    <u>Medical Records from November 17, 2001 to December 1, 2002</u>

Ms. Busch was injured in a motorcycle accident on November 17, 2001 and suffered a traumatic brain injury, left ankle fracture, left wrist fracture, fracture of the cervical spine, multiple thoracic fractures, and multiple facial fractures.  (R. at 131.)  Ms. Busch was treated at the Mayo Clinic and discharged on December 10, 2001.  (<u>Id.</u>)

On December 14, 2001, Ms. Busch was seen by Dr. Bergquist.  (R. at 146-47.)  Dr. Bergquist reported serious impairments with Ms. Busch's learning, memory, attention, concentration, and language.  (Id.)  Ms. Busch had taken the Galveston Orientation and Amnesia test the previous day, and her score was a 49.  On December 14th, her score was 64, which approached the normal range.  (Id.)

Treatment summaries from mid-2002 report unremarkable results from an examination of Ms. Busch's left ankle, left hand and wrist, and head. (R. at 273-74.)  On March 5, 2002, Dr. Dekutoski stopped prescribing narcotics for Ms. Busch because she did not need them any longer for pain management.  (R. at 287.)  The doctor also instructed Ms. Busch to stop smoking because it was hindering the healing of her fractures.  (Id.)  He specifically attributed the lack of bone formation to her nicotine use.  (Id.)  On April 8, 2002, Ms. Busch had no complaints other than being in a halo.  (R. at 286.)  Her doctor described her as "doing quite well."  (Id.)

Dr. Bergquist performed a neuropsychological evaluation on April 10, 2002.  (R. at 390-93.)  Results showed impaired memory, impaired to average language abilities, and impaired to low-average attention and concentration.  (Id.)  Tests revealed mild to moderate cognitive dysfunction,

some features of which had actually declined since she was last tested in January 2002.  (Id.)

On May 16, 2002, Ms. Busch reported that her ankle pain did not hinder her daily activities.  (R. at 369.)  X-rays were normal but showed early degenerative arthritis.  (Id.)

On June 6, 2002, Ms. Busch complained of shoulder soreness, but no significant neck pain.  (R. at 285.)  She also denied any tingling, weakness, or numbness in her arms or legs.  (Id.)  Ms. Busch did report ankle pain, which her doctor attributed to early arthritis.  (R. at 286.)  Dr. Dekutoski again advised Ms. Busch to refrain from smoking as it was interfering with her fractures healing.  (R. at 286.)  Ms. Busch said she was not interested in stopping smoking.  (Id.)

On June 29, 2002, while Ms. Busch was intoxicated, she fell backward in her bathroom and struck her head on the sink.  (R. at 365.)  She was transported to the hospital in an ambulance.  (Id.)

In August 2002, Ms. Busch was seen for her hand injury.  (R. at 351.)  Dr. Luong wrote that Ms. Busch had discontinued hand therapy because she noticed no improvement in being able to straighten her fingers.  (Id.)  However, Ms. Busch reported increased strength in her hand and being able to use her hand on a regular basis.  (Id.)  She denied experiencing any

- 6 -

discomfort.  Ms. Busch was unable to lay her hand flat on the examination

table.  (Id.)

Ms. Busch saw Dr. Bergquist on August 12, 2002 for a

neurobehavioral examination.  (R. at 352-53.)  Ms. Busch expressed an

interest in working as a truck driver, and she explained she would not be able

to return to her previous employment because of the cold temperatures and

amount of physical work involved.  Ms. Busch reported spending most of her

time doing housework, occasionally shopping, and spending time with her

neighbor.  (R. at 353.)  Dr. Bergquist did not perform a formal assessment of

Ms. Busch's mental status, but he recorded his impression that she was doing

relatively well.  (R. at 352.)

Ms. Busch also saw Dr. Schmidt on August 12, 2002 for a follow-

up examination.  (R. at 354-55.)  The physical examination revealed limited

neck rotation and some tenderness, significant flexion deformities in her

fourth and fifth fingers of her left hand, normal upper extremity strength,

normal lower extremity motor testing, including the left ankle, and normal

gait.  Dr. Schmidt wrote that Ms. Busch's left ankle pain was probably due to

early arthritis, but he recommended adding support to the ankle.  Ms.

Busch's neck pain was improving, and she was taking only one or two Aleve a

day.  (R. at 354.)  With respect to Ms. Busch's return to work, Dr. Schmidt

opined that she had mild cognitive impairment, decreased left upper extremity function, and left ankle pain.

Dr. Bergquist conducted a neuropsychological evaluation of Ms. Busch on October 30, 2002.  (R. at 344-349.)  He recalled that testing in April 2002 had revealed mild cognitive dysfunction, impaired visual constructional skills, and impaired learning and retention of complex information.  (R. at 349.) Six months later, Ms. Busch told the doctor that her memory was improving.  (R. at 348.)  Test results showed that Ms. Busch's memory was impaired to borderline impaired.  Her language abilities were functional and ranged from normal to low average.  Her attention and concentration abilities ranged from normal to low average.  Her mood, mental flexibility, and problem solving were normal.  Dr. Bergquist interpreted the results to reflect mild to moderate cognitive dysfunction with impaired learning efficiency, impaired memory retention, and to a lesser extent, difficulty with sustained concentration.  (R. at 349.)  The doctor thought the results were a "clear improvement" from previous tests.  (R. at 345.)  Dr. Bergquist commented that Ms. Busch's return to work may be problematic and should be done only with support and a plan in place.

## 2. __Medical Records from December 1, 2002__

On December 21, 2002, consulting physician Dr. Alsdurf completed a Psychiatric Review Technique Form for § 12.02, Organic Mental Disorders.  (R. at 319-332.)  In assessing the "B" criteria of the listing, he concluded that Ms. Busch experienced mild restrictions in activities of daily living; mild difficulties in social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and one episode of decompensation.  (R. at 329.)  Dr. Alsdurf also completed a Mental RFC assessment and found moderate limitations with Ms. Busch's abilities to understand and remember detailed instructions, carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace, and respond appropriately to changes in the workplace.  (R. at 433-34.)  All other abilities were not significantly limited.

Consulting physician Dr. Phibbs completed a Physical RFC assessment on January 20, 2003.  (R. at 424-31.)  He found Ms. Busch could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and walk for about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push and pull with her upper and lower extremities, though with some limitation.  (R. at 425-26.)

On February 3, 2003, Ms. Busch had surgery on her left hand. (R. at 419.)  Post-operative treatment showed that her fingers were acceptably positioned and aligned.  (R. at 418.)  Her ability to extend her fourth and fifth fingers at one joint was mildly limited, but the other joints extended fully. (Id.)  On February 21, 2003, Ms. Busch underwent physical therapy on her hand.  (R. at 334.)  The therapist reported significant limitations in her left ring finger and small finger extension.  (Id.)  The therapist also noted that Ms. Busch was not wearing her splint and told her to wear it full-time.  (Id.)  A treatment summary from February 2003 showed mild lateral displacement of Ms. Busch's fourth and fifth fingers on her left hand.  (R. at 416.)

Ms. Busch was seen by Dr. Berger on March 9, 2004.  (R. at 440.) Upon entering the examination room, Ms. Busch told the doctor she did not desire treatment but was there to obtain a report for her disability claim.  (Id.) Dr. Berger noted a full range of motion in her ankle and minimal pain.  (Id.) Ms. Busch reported that Aleve helped her pain and that her pain did not limit her daily activities.  (Id.)

Ms. Busch indicated to Dr. Berger that she needed an independent neurological/psychological evaluation for her disability claim. (R. at 465.)  Dr. Berger referred her to Dr. Lachance.  (Id.)

Dr. Lachance met with Ms. Busch on March 31, 2004.  (R. at 468-69.)  Dr. Lachance felt that Ms. Busch would show improvement in her cognitive functioning since she was last tested in October 2002.  He found no reason to think her cognitive abilities had worsened.  (R. at 468.)  Dr. Lachance described Ms. Busch's neurologic symptoms as unremarkable, and the neurological exam was normal.  (R. at 469.)  The doctor thought, with respect to Ms. Busch's ability to work, that she would not be able to return to her previous employment which required high volume output in a cold environment.  (R. at 468.)  However, the doctor stated Ms. Busch was "not totally disabled and there is no doubt some position that exists where she could potentially be employed in a structured repetitive type of task that does not involve high volumes, but does involve the ability to grade output to her levels."  (R. at 469.)

### 3.   __The Hearing Testimony__

Ms. Busch testified that she is unable to work because she poses a risk to other people and her memory is poor.  (R. at 28.)  She writes many things down in a notebook she carries with her.  (R. at 34-35.)  Ms. Busch has poor stamina, and she tires easily.  (R. at 28.)  She gets upset easily and does not tolerate stress well.  (R. at 35.)  She has pain in her ankle, hand, and neck.  (R. at 30.)  During the day, she does laundry, cooks, cleans, watches

television, and goes outside if the weather permits.  (R. at 30, 36.)  She drives

to the store.  (R. at 35.)  Her hobbies include fishing and gardening.  (R. at

31.)  She can walk two blocks, stand for thirty minutes, sit for thirty minutes,

and lift ten pounds.  (Id.)

Dr. Butler, a medical expert, testified that there were two periods

of recuperation from Ms. Busch's motorcycle accident.  (R. at 40.)  From

November 2001 through October 2002, Ms. Busch's daily activities were

markedly impaired.  (R. at 41.)  Immediately after the motorcycle accident, Ms.

Busch's memory, attention, and concentration were severely impaired.  (Id.)

Persistence and pace were markedly impaired.  (R. at 42.)  By October 2002,

however, Ms. Busch's attention was rated average, although her memory was

still somewhat impaired.  (R. at 41.)  Her daily activities during this later

period show only moderate physical impairment.  (Id.)  Her attention,

concentration, and persistence were average to above-average, according to

psychological testing.  (R. at 42.)  In April 2002, testing revealed a low/average

verbal IQ and an upper-borderline performance IQ.  (R. at 42.)  Dr. Butler

concluded that Ms. Busch could work at routine and repetitive tasks, but not

at a rapid pace or high production output, and with only brief and superficial

contact with others.  (R. at 43.)

The vocational expert, Kathryn Schrot, testified in response to a hypothetical question propounded by the ALJ.  (R. at 44-47.)  The question contained the following limitations:  lifting and carrying twenty pounds occasionally and ten pounds frequently; impairments of status post left ankle fracture, left arm injury, cervical and thoracic fractures, post head injury, and possible alcohol abuse; limited to light work; no heights, ladders, scaffolding, or left foot-pedal manipulations; only occasional rotation, fixation, and flexation of the neck; no power gripping, twisting, pounding, or fine fingering; low stress environment; routine, repetitive tasks; low-level, semi-skilled; only brief and superficial contact with others; and only minimal changes in work processing or task assignments.  (R. at 45.)  A person with these restrictions could work as a food assembler and production worker.  (R. at 46.)

**B.**     **Whether the ALJ Erred in Finding that Ms. Busch Was Not Disabled as of December 1, 2002**

The Court finds there is substantial evidence in the record supporting the ALJ's decision that Ms. Busch was not disabled as of December 1, 2002.  Other than the surgery on Ms. Busch's hand in February 2003, the record is notably devoid of medical evidence until Ms. Busch met with Dr. Berger for the purpose of obtaining a report for her disability claim.

**1.**     **Dr. Lachance's Opinion**

Ms. Busch gives great weight to Dr. Lachance's opinion that she would be precluded from working at her former job as a food assembler at Mrs. Gerry's, but she takes this opinion to an impermissibly broad conclusion that she would also be precluded from working in all other production jobs.  (Pl. Mem. Supp. Mot. Summ. J. at 10.)  In fact, Dr. Lachance foreclosed the food assembler position only because that specific job at Ms. Gerry's required high volume output in a cold environment.  These requirements would not necessarily be true for all production jobs.  Further, Dr. Lachance stated that Ms. Busch could work at jobs involving structured, repetitive tasks that did not involve high volumes and did not require high production goals.  This statement would not prevent Ms. Busch from working at all production jobs. Contrary to Plaintiff's contention, the ALJ specifically referred to Dr. Lachance's opinion in her decision, relying on it to find that Ms. Busch would experience only moderate restrictions in maintaining concentration, persistence, and pace.  (R. at 16, 19.)

The opinion of Dr. Butler correlated with that of Dr. Lachance. Dr. Butler concluded that Ms. Busch could work at routine and repetitive tasks, but not at a rapid pace or high production output.  The ALJ referred to and relied on Dr. Butler's opinion as well.  (R. at 20.)  The ALJ did not err in relying on Dr. Butler's opinion because the testimony of a medical expert can

constitute substantial evidence.  <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir.

1996); <u>see also</u> 20 C.F.R. § 404.1527(f)(2)(iii) (permitting ALJs to consider

opinions from medical experts).

### 2. **Capacity for Light Work**

Ms. Busch next challenges the ALJ's RFC assessment that she

could perform light work.  For support, Ms. Busch directs the Court to the

medical record and to her testimony at the hearing.

The Court finds that the medical record as of December 1, 2002,

supports the ALJ's determination that Ms. Busch could perform light work.

As previously noted, the medical record is sparse after this date.  Other than

the surgery on her left hand in February 2003, Ms. Busch sought no medical

treatment from November 2002 until March 2004, when she saw Dr. Berger

solely for the purpose of obtaining a disability report.  The relatively recent

opinions of Ms. Busch's treating physicians, Dr. Berger and Dr. Lachance,

both support the ALJ's determination that she could perform light work.  Ms.

Busch sought a disability report, but no treatment, from Dr. Berger for her left

ankle. The doctor noted a full range of motion in Ms. Busch's ankle and

minimal pain.  Ms. Busch's neurological/psychological exam with Dr.

Lachance was unremarkable and reflected a capacity for light work.  The

reports of consulting physicians Dr. Alsdurf and Dr. Phibbs also support the

ALJ's determination that Ms. Busch could perform light work.  Evidence from consulting physicians may constitute substantial evidence.  <u>Raney v. Barnhart</u>, 396 F.3d 1007, 1010 (8th Cir. 2005); <u>see also</u> 20 C.F.R. § 404.1527(f)(2)(i) (requiring ALJs to consider opinions of non-examining medical sources).

Ms. Busch specifically directs the Court to her testimony that she could lift only ten pounds, stand for only half an hour, and only walk to her mailbox and back.  The Court finds these claims completely unsupported by the medical record.  None of Ms. Busch's doctors recorded such functional limitations.   Numerous medical records show there is no weakness or limitation in her upper extremities.  In May 2002, Ms. Busch said that her ankle pain did not hinder her daily activities.  X-rays of her ankle were normal.  Ms. Busch denied any tingling, weakness, or numbness in her upper extremities and legs in June 2002.  In August 2002, she told her doctor that she had increased strength in her hand, was able to use her hand on a regular basis, and had no discomfort.  Her doctor reported normal lower extremity testing and normal gait.  The medical record and Ms. Busch's own reports to her doctors belie her claimed subjective limitations.

Based on the medical record, Dr. Phibbs concluded that Ms. Busch could occasionally lift fifty pounds and frequently lift twenty-five

- 16 -

pounds.  Notably, the ALJ reduced Ms. Busch's ability to lift even further than Dr. Phibbs recommended: to twenty pounds occasionally and ten pounds frequently.  Dr. Phibbs also determined that Ms. Busch could stand and walk for about six hours in an eight-hour workday.  Ms. Busch has not challenged Dr. Phibbs' opinion.

To the extent Ms. Busch is challenging the ALJ's assessment of her credibility with respect to her ability to lift, stand, and walk, the Court finds the ALJ properly discounted these subjective complaints.  As discussed above, Ms. Busch's testimony was inconsistent with the record as a whole and was not supported by the medical record.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Even though Ms. Busch has not challenged the ALJ's assessment of the other Polaski factors, the Court finds the ALJ did not err in evaluating Ms. Busch's daily activities; prior work record; the duration, frequency, and intensity of her pain; the dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; or functional restrictions.  See id.  The ALJ noted that Ms. Busch drives, cooks, cleans house, shops, reads, watches television, grooms and bathes herself, goes out to eat and to movies, and occasionally goes for walks.  These activities may be used to discount a claimant's subjective complaints.  Lawrence v. Chater, 107 F.3d 674, 676 (8th

Cir. 1997) (affirming ALJ's decision to discount credibility where claimant could do some housework, cook, and shop); <u>Nguyen v. Chater</u>, 75 F.3d 429, 430 (8th Cir. 1996) (affirming ALJ's decision to discount credibility where claimant visited neighbors, cooked her own meals, did her own laundry, and attended church).  The ALJ considered that Ms. Busch reported no side effects from her medications.  (R. at 20.)  Further, her prior work record was inconsistent, which the ALJ interpreted as indicating a lack of interest or need for full-time employment.  (<u>Id.</u>)  In sum, the ALJ did not err in rejecting Ms. Busch's subjective complaints as to her ability to lift, walk, and stand.

**C.**     **<u>Whether the ALJ Erred in Finding that Ms. Busch Could Perform Her Previous Work</u>**

When the ALJ formulated the hypothetical question to the vocational expert, she included the limitations suggested by Dr. Lachance and Dr. Butler:  light work, routine and repetitive tasks, low-level, semi-skilled, and only minimal changes in work processing or task assignments.  The Court has found that the ALJ did not err in considering the opinions of Dr. Lachance and Dr. Butler.  The Court has also found that the ALJ did not err in rejecting Ms. Busch's claimed subjective limitations in lifting, standing, and walking.  A hypothetical question must include only the impairments and limitations accepted by the ALJ.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1220

(8th Cir. 2001) (citing Chamberlain v. Shalala, 47 F.3d 1489, 1495-96 (8th

Cir.1995)).

Immediately before the vocational expert answered the

hypothetical question, she considered Ms. Busch's limitation in production

output and testified that it did not change her opinion.  (R. at 44).  The

vocational expert then testified that a person with the restrictions enunciated

by the ALJ could work as a food assembler and a production worker, which

were Ms. Busch's previous jobs.  The Court finds no error in this response.

Moreover, the ALJ was not even required to obtain vocational

expert testimony at step four of the sequential analysis because a claimant

has the burden to show she cannot perform her prior work.  Banks v.

Massanari, 258 F.3d 820, 827 (8th Cir. 2001) (citations omitted).  Ms. Busch

has not shown by medical evidence or vocational testimony that she cannot

work as a food assembler or a production worker.  Dr. Lachance's opinion that

Ms. Busch could not work as a food assembler at Ms. Gerry's would not

necessarily foreclose all employment as a food assembler because not all such

jobs would require a high volume output and cold environment, which were

the conditions Dr. Lachance found objectionable.  Moreover, the ALJ took into

account the production limitation suggested by Dr. Lachance in her RFC

finding.  (R. at 19.)  Finally, the ALJ was entitled to rely on Dr. Lachance's

conclusion that Ms. Busch was "not totally disabled and there is no doubt some position that exists where she could potentially be employed in a structured repetitive type of task that does not involve high volumes, but does involve the ability to grade output to her levels" in finding Ms. Busch could work as a food assembler or production worker.  (R. at 469.)

### D.    Whether the ALJ Erred in Finding that Ms. Busch Could Perform Other Work in the National Economy

Even if the ALJ erred in finding that Ms. Busch could perform her past relevant work, the vocational expert testified that Ms. Busch could also work as a hand assembler and a packager.  Ms. Busch has not challenged this evidence or the ALJ's adoption of this finding.  The Court finds no reason to reject the ALJ's conclusion at step five that Ms. Busch was not disabled because she could perform other work in the national economy.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED**:

(1)    Ms. Busch's Motion for Summary Judgment (Doc. No. 8) should be **DENIED**; and

(2)    The Commissioner's Motion for Summary Judgment (Doc. No. 10) should be **GRANTED**.

Dated:  August 5, 2005

s/ Jonathan Lebedoff

JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by  August 22, 2005  .  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  A District Judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.